### NORFOLK & W. RY. CO. v. REED.

(Circuit Court of Appeals, Fourth Circuit. December 16, 1908.)

No. 791.

1. MASTER AND SERVANT (§ 125*)—MASTER'S LIABILITY FOR INJURIES TO SERVANT—DEFECT IN APPLIANCES—KNOWLEDGE OF MASTER.

While it is the duty of a master to furnish the servant with safe appliances with which to work and to keep the same in good repair, where an appliance furnished is defective, and an injury to a servant results, the existence of such defect must have been known to the master, or it must be shown that a sufficient time had elapsed before the time of the injury to raise the presumption that the master had knowledge of the same, in order to entitle the servant to recover for the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 243–251; Dec. Dig. § 125.*]

2. MASTER AND SERVANT (§ 278*)—MASTER'S LIABILITY FOR INJURIES TO SERVANT—ACTIONS—EVIDENCE OF MASTER'S NEGLIGENCE—DEFECTIVE RAILROAD CAR.

Plaintiff, an experienced brakeman, working in the yard of defendant railroad company, while attempting to operate a brake on a moving flat

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

car, fell or was thrown off and injured. The car belonged to another company, had come into the yards in a train about 3 a. m., and the injury occurred about 11, while plaintiff and others were moving the cars to another part of the yard. The car was equipped with a drop brake, the stem of which when not in use drops to a level with the floor of the car and must be raised when used. Plaintiff testified that the brake stem was standing upright when he mounted the car, and that when he attempted to use it the stem slipped down and threw him off. Such brakes were in common use, although plaintiff testified that he had never used one. The one in question was inspected immediately after the accident and found in perfect working order. The car had also been inspected previously, after its arrival in the yard, by two inspectors working together on opposite sides of the train, both of whom testified that the brake was not defective and was in normal position; that if the stem had been standing upright they would have observed it. *Held* that, assuming the correctness of plaintiff's testimony as to the position of the brake stem, there was no ground for charging defendant with negligence or with liability for the injury, in the absence of any evidence to show how long it had been in such position or who placed it there.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

Waddill, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of West Virginia, at Charleston.

For opinion below, see 162 Fed. 750.

This was an action for damages brought by the defendant in error against the plaintiff in error for injuries received while acting in the discharge of his duties in the capacity of brakeman and in the employ of the plaintiff in error on the 6th day of October, 1905, in the yards at Bluefield, W. Va.

The record discloses that the defendant in error was an experienced brakeman, and that prior to the accident he had been employed as brakeman for a period of two years on the Chesapeake & Ohio Railroad, and on the Norfolk & Western Railway for five additional years, making an aggregate experience of seven years. At the time of his injury, defendant in error was employed in the Bluefield yards. In the yards there were three flat cars, loaded with steel rails, which had been brought in that morning about 3 o'clock, and orders had been given to remove them to the east end of the yard, there to be unloaded. The rails protruded beyond the ends of these cars, so that it was impossible or impracticable to couple the yard engine onto them, and consequently they were taken out of the train, and an effort was made to roll the cars down the track by gravity so that the engine might be brought in behind them. The car in front and the one behind were Norfolk & Western cars, while the one in the middle was a Georgia Southern & Florida car, and was equipped with what is known as a "drop brake," that is, the brake staff, when not held up by the brakeman for the purpose of putting on or taking off the brakes, is intended to drop down under the car, with the handle on a level with the floor thereof. The handle to the brake was an ordinary crossbar, forming with the end of the brake staff something like the letter "T."

The evidence shows that the conductor, a brakeman by the name of Compton (deceased at the time of the trial), and the defendant in error, after the three cars had been cut out from the train, in order to start them down the track, were pushing them, and, when they had succeeded in starting the cars, each of the parties mentioned climbed upon his particular car to manipulate the brake as necessity might require, the defendant in error mounting the middle car, which was equipped with a drop brake, as stated. The plaintiff below alleged that he was unfamiliar with this kind of brake, and, when he went to release the brake, he found the brake stem standing above the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

floor of the car about the same height of a stationary, or ordinary rigid brake, which he supposed the same to be; that, when he grasped the brake stem for the purpose of manipulating the brake, the same fell to its normal position, precipitating him to the ground between the car upon which he was riding and the car following, whereby he lost one leg and was otherwise injured.

The cause came on to be heard in the District Court for the Southern District of West Virginia, and the plaintiff below received a verdict for $10,000, whereupon a writ of error was sued out to this court.

John H. Holt (Theodore W. Reath, Joseph I. Doran, and Holt & Duncan, on the briefs), for plaintiff in error.

Joseph H. Gaines (Staige Davis, Upshur Higginbotham, and H. D. Rummell, on the briefs), for defendant in error.

Before PRITCHARD, Circuit Judge, and WADDILL and BOYD, District Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). There are six assignments of error filed herein, but we deem it necessary to consider only the second assignment, which is as follows:

"The court erred in refusing to sustain the motion of the defendant to direct the jury to return a verdict in favor of the defendant and against the plaintiff, because there was not a scintilla of evidence to establish knowledge on the part of the defendant, either actual or constructive, that the brake complained of was either defective, or out of repair and dangerous."

The jury found, upon a special interrogatory, that the inspection of the brake, shortly after the arrival of the car, was not a proper and sufficient one, as a matter of fact, and upon this finding the case seems to have been determined by the court below.

In order to properly settle the questions presented for our consideration, it becomes necessary to determine as to whether, under the circumstances, the finding of the jury to the effect that there had not been a proper inspection of the brake in question in that the brake was found in an abnormal position would be sufficient to charge the defendant below with negligence. It is well settled that it is the duty of the master to furnish the servant with safe appliances with which to work, and, having furnished such appliances, it still remains the duty of the master to keep the same in good repair. While this duty is imposed upon the master, nevertheless, in a case where it is shown that the appliance furnished was defective, the existence of such defect must have been known to the master, or it must be shown that a sufficient time had elapsed before the time of the injury to raise the presumption that the master had knowledge of the same, in order to entitle the party thus injured to recover. The appliance known as the "drop brake," or disappearing brake, according to the evidence, is in common use on many of the railway systems of the country, in the interchange of traffic incident to interstate business. Cars equipped with such brakes are used on almost every railway system throughout the country, and it appears, in this instance, that cars thus equipped had been in use on the Norfolk & Western Railway system for a number of years. The drop brake is distinguished from the ordinary upright or rigid brake in that it is in the shape of a bar like a T, the ordinary brake being circular in form and in the shape of a

wheel. Therefore, when the brakeman, on this occasion, who had been in the employ of the Norfolk & Western Railway for about five years, and perfectly familiar with a brake shaped like a wheel, saw this brake, he was put upon notice that it was not the ordinary brake in use upon that system, and owing to the pattern of the handle, he must have known that it was a drop brake, inasmuch as he testified that he had seen brakes of that character, and therefore, in the manipulation of the brake, he should have governed himself accordingly.

On page 29 of the record, the defendant in error testified as follows in regard to the condition of the brake at the time he was injured:

"Q. When did you go to work in the railroad service? A. Well, sir, I went to work on the C. & O. in 1892. Q. How long did you remain with the Chesapeake & Ohio? A. A couple of years. Q. In what capacity? A. Brakeman. Q. Freight or passenger trains? A. Freight. Q. With what company did you next take employment? A. The Norfolk & Western Railroad Company, as far as railroad companies are concerned. Mr. Holt: That's what I mean. Q. How long did you remain there? A. I stayed until the latter part of 1900, when this injury happened. Q. You were with them about five years? A. Only about five years. Q. And with the Chesapeake & Ohio two years? A. Yes, sir. Q. In what capacity did you work when you were with the Norfolk & Western? A. As a brakeman. Q. You, then, as I understand, you had, prior to this accident, seven years' experience as a brakeman? A. Yes, sir. Q. Upon freight trains? A. Freight and passenger trains. * * * Q. What kind of handle is used on the Norfolk & Western freight-car brakes? A. There is a wheel used. Q. Do they have upon any of their freight cars— Are there any brakes with a handle that is not a wheel? A. I have never seen them; no, sir. Q. Then they have no handles on their brakes in the shape of a bar like this T that you have described? A. The Norfolk & Western hasn't any. If they have, I have never seen it. Q. When you approached this brake, then, you saw it was not a wheel, and it had to have a handle? A. Why, certainly, I saw it was not a wheel. Q. And that it was a mere crossbar? A. Yes, sir. Q. Did you ever see any of these drop brakes? A. I never handled any of them. Q. That is not my question. Have you ever seen any of these drop brakes? A. Yes, sir; I have seen them, laying down—the drop brakes they have."

It appears from the foregoing that the defendant, although he had never operated one of these brakes, had seen them and knew that they were in use on the Norfolk & Western Railway, and that he was familiar with the peculiar shape of the handle of the same, which was the distinguishing feature of this brake. Do the facts in this case give the defendant in error any better standing than he would have had if he had found the brake in its normal position and had been injured in attempting to operate it? For illustration, suppose, when the brakeman attempted to operate the brake, he had found it in a normal position and had raised it up to the position which it should occupy while being operated, and then, in attempting to manipulate the brake, he had kicked the ratchet loose so as to render it capable of being operated, and it had dropped down to its normal position, precipitating him under the car and resulting in his injury, and upon subsequent examination the brake had been found to be in perfect working order and without defect; can it be reasonably contended that under such circumstances he would have been entitled to recover damages for the injuries thus sustained? We think not—and why? Because the accident in that case would not have been due to the

failure of the master to furnish sufficient and safe appliances with which to work, but would have been due solely to the improper manipulation of the appliance furnished. Therefore the only difference between the case which we suppose and the one now before us is that instead of finding the brake in a normal position, thereby being required to raise it up so as to be able to operate it, the defendant in error testified that he found it in a position where he only had to knock the ratchet loose in order to be able to apply the brake by its proper manipulation, and which, according to the evidence, could have been operated without injury to the brakeman, inasmuch as it was in good condition.

It was shown by the testimony of the two inspectors who inspected the brake immediately after the accident that it was in good condition and without defect. The witness A. J. Albright testified as follows:

"Q. What is your business? A. I am a car inspector at the present time. Q. How long have you been a car inspector? A. I suppose I have been working at that about four or five years—between four and five years. Q. For what railroad? A. For the Norfolk & Western Railway Company. Q. At what point? A. At Bluefield, W. Va. Q. Do you recollect the time Mr. Reed was hurt over in the Bluefield yard? A. Yes, sir. Q. Do you recollect the date? A. Yes, sir. Q. What year was it? A. In 1905. Q. You may tell the jury whether or not, at or near the time of that injury or accident to Reed, you inspected—in company with Mr. Evans—the car from which he is said to have fallen? A. Yes, sir; I helped to inspect the car. Q. Do you recall what time in the day it was? A. It was near 12 o'clock, as well as I recollect. Q. How did you come to go there to inspect that car, Mr. Albright? A. Mr. Evans told me that he wanted me to go with him to inspect that car; we were working together. Q. Tell the jury whether or not you did inspect it. A. Yes, sir. Q. What did you find? A. I did not find anything wrong with the car at all. Q. Did you examine this drop brake? A. Yes, sir. Q. What condition was it in? A. We found it in good condition. Q. Tell the jury whether or not the brake stem was bent. A. It was not bent. Q. Was there anything the matter with it? A. There was not anything the matter with it."

The witness John Evans testified as follows:

"Q. What is your business? A. I am a car inspector. Q. For what road? A. The N. & W. Q. Is that the Norfolk & Western? A. The Norfolk & Western; yes, sir. Q. At what point do you inspect cars? A. At Bluefield, W. Va. Q. How long have you been a car inspector? A. For nine years. Q. With this company all the while? A. Yes, sir. Q. How long have you been in the railroad service? A. For 15 years. Q. In what capacity did you work before you became a car inspector? A. I was a car repairer. Q. At what point? A. At Bluefield, W. Va. Q. What are your duties now as car inspector? A. My duties are to examine cars on their arrival. Q. What kind of an examination do you make? A. We go over the train on its arrival and inspect for defects in the wheels, brakes, and for any defects. Q. Then you examine the brakes, wheels, and every part of the car? A. Yes, sir. Q. If you find a defect, what do you do? A. We shop it. Q. What do you mean by shopping it? A. We chalk it for the shop track. Q. Then what becomes of it when you mark it defective? A. The yard crew then shifts it over to the shop track. Q. It goes over then for repairs? A. Yes, sir. Q. Do you recollect the time of the accident to the plaintiff here, Mr. Reed? Do you recollect when the plaintiff, S. P. Reed, was hurt at Bluefield? A. Yes, sir. Q. Were you a car inspector at that time in that yard? A. Yes, sir. Q. Do you recall the C. S. & F. car 6,048? A. Yes, sir. Q. You may tell the jury whether or not you inspected that car on that day. A. Yes, sir; I did. Q. When did you inspect it? A. We inspected it just a while before 12 o'clock. Q. On the 6th of October? A. Yes, sir; 1905. Q. Was that

before or after Reed was hurt? A. It was afterwards. Q. How long afterwards? A. I do not know how long; I did not see the accident. Q. Who did you take with you to inspect this car? A. Mr. A. J. Albright. Q. Is he one of your inspectors? A. Yes, sir. Q. Is he here? A. Yes, sir. Q. Tell the jury just what inspection of that car you made. A. Well, we went to that car—he on one side and I on the other—and inspected it closely for defects of any kind, and didn't find any defects at all of any kind whatever. Q. Tell the jury whether or not you tested the drop brake on that car. A. Yes, sir; I made three different tests of it; I raised that brake to its proper position three different times. Q. And when you raised it what did it do? A. It would then go to its proper position. Q. Where is that proper position? A. Down just even with the floor of the car. Q. You may state whether or not you found any defect in that brake. A. I didn't find any defect at all. Q. Was it defective? A. It was not defective. Q. How many times did you say you tried it? A. Three times. Q. Tell the jury whether or not it operated properly. A. Well, it did; it operated properly. Q. Tell the jury whether or not, when you let go of it, it would stand up. A. No, it would not. Q. Tell the jury in what condition you found it when you went there to inspect it—whether or not it was standing or down. A. It was down. Q. You may tell us also whether or not that brake stem was bent and out of shape in any way. A. It was not bent at all."

And the witness J. R. Carter testified as follows:

"Q. What is your business? A. I am a car inspector, now. Q. How long have you been a car inspector? A. About four or five years. Q. For what railway? A. For the Norfolk & Western Railway Company. Q. At what point? A. At Bluefield. Q. You may tell the jury whether or not you were on duty as an inspector at Bluefield on the night of the 5th of October and the morning of October 6, 1905. A. I was. Q. Who were engaged as inspectors with you? A. Mr. Tynes. Q. You may state whether or not you inspected all cars coming into that yard that night, coming from Roanoke. A. I did. Q. You may state whether or not you marked all cars that were defective. A. Yes, sir; I did. Q. How did you mark them? A. With white chalk. Q. For what purpose? A. As notice to the repairman what it was chalked for. Q. Where would that send the cars? A. To the repair track—the shop track—or whatever you wish to call it. Q. That is for the purpose of mending them, is it? A. Yes, sir. Q. What kind of mark do you make on them? A. Well, we haven't got any regular mark—any particular mark at all; just a straight mark, and sometimes a cross mark. We most always make a cross mark on a defective car. Q. Are you familiar with what is known as the 'drop brake'? A. I am. Q. If there had been, on that night, any car with a drop brake, the stem of which was standing up, would you have discovered it? A. I would. Q. Why would you have discovered it? A. Because it would have been in an improper position. Q. What would you do with it that would lead you to find it out? Do you try the brakes? A. Yes, sir. Q. Did you find any such on that night? A. I did not."

Among other things, the court submitted the following interrogatory, No. 5, to the jury:

"Q. No. 5. Was the brake on the car in question, to wit, G. S. & F. No. 6,018, when the same was inspected by Inspectors Evans and Albright immediately after the accident, in proper working condition and without defect? A. Yes."

Thus it will be seen that the jury, upon the foregoing evidence, reached the conclusion that the brake was in proper working condition and without defect immediately after the accident occurred.

While none of the witnesses contradict the testimony of the plaintiff as to how the accident occurred, there is no witness whose testimony tends in the slightest to corroborate the evidence of the plaintiff in that respect. There was the uncontradicted evidence of two

witnesses and a finding of fact by the jury that immediately after the accident the brake was found to be in perfect working order and without defect. It also appears from the evidence of the witness McDonald who testified on behalf of the plaintiff in error at the trial, that the brake when raised up would remain in that position only so long as the brake was held in the hands of the operator. Among other things, this witness testified as follows:

"Q. Are you familiar with what is known as the 'drop brake'? A. Yes, sir. Q. Are they not used on the G. S. & F. Railroad? A. Yes, sir. Q. How many cars with brakes of that character has that road now? A. Nearly 2,000, and some in the course of construction at the present time. Q. Is that brake in common use, Mr. McDonald? A. Yes, sir; in our section it is. Q. What roads use it? A. Well, the Southern Road has adopted it as a standard; the Central Georgia Railroad, the C., O. & T. P., the A., G. & S., the Georgia Southern & Florida, and a number of others that I do not remember particularly. Q. Will you please explain now to the jury how that brake works? A. In the manner of applying it, it stands down when it is not in use, on a level with the floor of the car; when you wish to apply the brake you raise it up and apply it, and as soon as you release the handle—your hands from the brake handle—the stem drops down. Q. When not in use, then, it remains under the car? A. Yes, sir; it remains down on a level with the floor of the car—down on a ratchet. Q. Is that true whether the brake be set or not set? A. Yes, sir. Q. Will it stand up at all? A. No, sir; not unless it is wedged. It might be wedged up in some way or other, or bent. Q. Could it be pinned up in any way? A. Not on that particular car. We have some cars in course of construction now that they can pin up—that have a wheel—but this one did not have a wheel; this had a stem with a crossbar and no holes so it could be pinned up. Q. Then that brake would not stand up at all except when in use? A. No, sir. Q. As I understand you, then, Mr. McDonald, that brake would not stand up except when in use unless it was wedged, or had a pin through it, or was so bent as to hold it? A. That is correct, sir."

This testimony tends strongly to contradict the evidence of the plaintiff as to how the accident occurred. If the plaintiff had testified that while in a stooping posture, attempting to raise the brake from its normal position so as to be able to successfully operate it, the cars came suddenly together owing to the manipulation of the brake on the rear car, which resulted in precipitating him between the cars, his testimony would have been in perfect harmony with the physical facts established by the witnesses who testified as to the condition of the brake immediately after the accident occurred.

This case was tried in the court below upon the theory that the condition of the brake was such, at the time of the injury to the defendant in error, that it presented a dangerous trap, and that the master could, by a proper inspection, have prevented the injury complained of by the defendant in error, and that the failure of the master to make such inspection constituted such negligence on its part as to entitle the defendant in error to recover. In order to entitle the defendant in error to recover, it is not only necessary that he should allege that the injury which he sustained was occasioned by the negligence of the master in failing to furnish sufficient and suitable appliances with which to work, but it is also incumbent upon him to show by a preponderance of the evidence that the injury which he sustained was due to the failure on the part of the master to furnish or equip the car with a safe and sufficient appliance—in this instance, to wit, a

drop brake without defect—and to maintain the same in a reasonably safe condition. When we review the testimony, we find that the brake, instead of being defective, was in proper condition, there being no defect of any nature in the construction and mechanism whatsoever discovered by the inspectors just a few moments after the accident happened.

It being shown that the accident was due to the manipulation of the brake, and it appearing that the brake was in proper working order, the question arises as to whether this condition of affairs does not preclude a recovery. But it is insisted, as hereinbefore stated, that the brake was in an abnormal position, and that it presented what might be termed a "death trap." Even if this were admitted to be true, we are still confronted with the proposition as to how or by what means the brake was placed in the position which it occupied at the time the injury was sustained. If the plaintiff below were entitled to recover on account of the brake being in an abnormal position, yet he would still be required to show by a preponderance of the evidence that the master was responsible for or had knowledge of the brake being in such position. The car on which the defendant in error was injured was brought into the yard at Bluefield at 3 o'clock a. m., and was inspected between that hour and 6 a. m. The two inspectors who made the inspection testified that they inspected the car in the usual manner, and that they failed to discover any defect in the brake or that it was in an abnormal position. The witness Tyne, who testified on behalf of the defendant below, testified as follows:

"Q. What are your duties as a car inspector, and what were they on the 6th day of October, 1905? A. Well, sir, the duties of a car inspector is to see that the grab irons, coupling rods, couplings, wheels, and brakes are all in perfect order. Q. When did you examine the freight cars in respect to the time that they came into the yards? A. Immediately after arriving there. Q. And if you found a car defective in any respect, what would you do with it? A. We would shop it to the repair track. Q. Do you recollect of there being an inspection of the Georgia, Southern & Florida freight car 6,048? A. I could not say; we are not required to take the number of each car in a train, and I could not say. Q. Were you on duty in the yard as an inspector on the morning of the 6th of October, 1905? A. I was; yes, sir. Q. Can you tell this jury whether or not you inspected the cars in a train brought there that morning from Roanoke by Conductor Powell? A. I did, but I do not know what conductor brought the train in; we don't get to see them. Q. Did you inspect all cars? A. All trains; yes, sir. Q. What time did you make an inspection that day—that morning? A. Well, I could not tell you exactly what time it was; I did not take the time. Q. When did you come to work? Tell us what you did do. A. We went to work at 6 o'clock p. m. on the evening of the 5th, and left at 6 a. m. on the morning of the 6th. Q. Did you shop any cars on that night? A. Yes, sir. Q. How many? A. I could not tell exactly; 50 or 60, or something like that, we shopped out. Q. State whether or not you shopped all the cars that were defective. A. Yes, sir; I did. Q. State whether or not you omitted or overlooked any. A. I do not think I overlooked any; no, sir. The Court: When did you quit work? A. At 6 o'clock a. m. on the morning of the 6th. Mr. Holt: When you inspected these cars and found them defective, did you mark them in any way? A. Yes, sir, with white chalk. Q. Of what does your inspection consist? What do you do while you are inspecting? A. We are supposed to— (interrupted). Q. Not what you are supposed to do, but what do you do? A. We find the defects in the cars. Q. How do you do that? Do you use a spyglass, or what is the practice? A. No, sir; we use

the naked eye. Q. Tell the jury what you do? A. We pass from one end of the train to the other. There are two of us—one on one side, and one on the other—and we go along and look at the wheels, brakes, grab irons, and lift rods. Q. Are you familiar with what is known as the 'drop brake'? A. Yes, sir; I have seen them. Q. You may tell the jury whether or not, had there been any drop brake standing up, you would have discovered it in your inspection. A. I would; yes, sir. Q. Did you discover any such? A. I did not. Q. Were there any such in that condition when you inspected them? A. None that I seen. Q. Well, did you see them all? A. I saw them all; yes, sir; but there was none that way. Q. You may likewise tell us whether or not you inspected the trains that came in from Roanoke between the hours you were on duty. A. Yes, sir; I did. Q. Who inspected with you? A. Mr. Carter. Q. Is he here? A. Yes, sir."

Here was an inspection made in the usual manner by competent inspectors, and by which it is shown that the brake in question was without defect and that it was in proper condition. It is true that the inspectors state, on cross-examination, that the examination was rapid, and that they examined from 30 to 45 cars in 40 minutes; but that they passed from one end of the train, one on one side and one on the other, and that in doing so they looked at the wheels, the brakes, the grab irons, and the lift rods. They testified that they were familiar with the drop brake, and the witness Tyne testified that if there had been any drop brake standing up he would have observed it while making the inspection, and then, in response to the question as to whether he did discover it, he said, "I did not."

Let us assume that it is not only the duty of the master, in furnishing this particular kind of brake, to furnish a brake which is without defect and in perfect working order, but that it is also his duty to keep it, when not in use, in its normal position; yet, in case of accident on account of such brake being in an abnormal position, the burden would be upon the party injured to show that the master knew, or could by the lapse of time have had knowledge, of the position of the brake. Therefore it becomes necessary to determine as to how or by whom the brake was placed in the position which it is contended by defendant in error that it occupied at the time he was injured. There is nothing in the evidence to justify the inference that the brake, on this occasion, was placed in an abnormal position by an employé of the railroad, because there is no evidence to show that any one acting for or on behalf of the company attempted to move the car until 11 a. m. of that day, and the inspection was made between the hours of 3 a. m. and 6 a. m. The finding of the brake in an abnormal position was one of those unforeseen contingencies which the master could not by any means anticipate, and to hold the master liable under such circumstances would be to ignore all precedents, and to establish a rule which would impose upon the master a duty the performance of which would be a physical impossibility. There is not a scintilla of evidence to show how long the brake had been in an abnormal position. It may have been 30 minutes, or it may have been an hour, or longer, but the evidence of the inspectors renders it quite improbable that it could have been placed in that position before the time of its inspection, to wit, some time between 3 o'clock and 6 o'clock on the morning of the injury. Is it not as reasonable to infer

that some mischievous boy, out of curiosity, or from other motives, raised the brake and left it in the position in which it was found by the defendant in error, as it is to infer that it was left in such position by the defendant below or some of its agents? The learned judge who tried this case below, in a very able opinion, in discussing the law relating to this phase of the question, among other things said:

"It is undoubtedly true that the general rule governing the proof requisite in the case of servants injured by defects in machinery or appliances requires that the plaintiff prove, not only the defect, but that the master either knew of it, or that it had existed for a sufficient length of time to warrant the fair presumption that he should have known of it."

This is undoubtedly a correct statement of the law, and, when we come to apply the evidence in this case, we are at a loss to see upon what theory the jury could have arrived at the conclusion that the injury was due to the negligence of the master. There is nothing in the evidence, so far as we can discover, to justify the inference that the condition of the brake had existed since the last time the same was handled in the regular operation of the train. There are many facts and circumstances which tend strongly to prove that such was not the fact. The court below also stated that if the jury had found that there had been a proper inspection of the brakes, and that they had been found in good condition and without defect at the time of inspection, to wit, between the hours of 3 a. m. and 6 a. m., he would have granted the motion to direct a verdict in favor of the plaintiff in error. If such motion had been granted, it could only have been upon the theory that, notwithstanding the brake was in an abnormal position at the time the servant was injured, a sufficient time had not elapsed from the time of inspection to raise the presumption that the master had knowledge of the fact that it occupied such position. The whole question as to how and by whom the brake was placed in an abnormal position is involved in uncertainty, and, in order to reach any conclusion in regard to the matter, it becomes necessary to base an inference upon an inference, and this would be in violation of the rules of evidence by which we are controlled in determining this controversy.

In view of all the facts surrounding this case, we are of opinion that there was not sufficient legal evidence in this case to sustain a verdict in favor of the defendant in error, and that the court below erred in refusing to grant the motion to direct a verdict in favor of the defendant below.

For the reasons hereinbefore stated, the judgment of the Circuit Court is reversed.

Reversed.

WADDILL, District Judge, dissents.